Filed 11/24/21  Citizens for a Safe and Sewage-Free McKinley Park v. City of Sacramento CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITIZENS FOR A SAFE AND SEWAGE-FREE McKINLEY PARK, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF SACRAMENTO et al., <br><br> Defendants and Respondents. | C090760 <br><br> (Super. Ct. No. 34-2018-80003015-CU-WM-GDS) |

The City of Sacramento (City) operates a combined sewer and stormwater system that serves over 200,000 residents in downtown Sacramento and surrounding areas, including the McKinley Park area in East Sacramento.  This case involves a challenge under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] to the McKinley Water Vault Project (the project), designed to reduce flooding

---

[1] Undesignated statutory references are to the Public Resources Code.

1

and the outflow of wastewater from the combined sewer system during large storm events by providing additional storage capacity for the system via a below-ground storage facility (the vault). Plaintiff Citizens For a Safe and Sewage-Free McKinley Park (Citizens) appeals from the denial of its mandamus petition seeking to set aside the City's certification of an environmental impact report (EIR) and approval of the project.[2]

On appeal, Citizens contends the EIR violated CEQA by failing to adequately analyze various environmental impacts of the project and failing to analyze a reasonable range of project alternatives. Citizens adds that recirculation of the EIR was required under CEQA due to the addition of significant new information following the public review period. We disagree with each of these claims of error and affirm.

## BACKGROUND

The City's combined sewer system collects and conveys both wastewater and stormwater within the same pipe network to facilities for treatment and safe discharge. While this system generally has sufficient capacity to handle stormwater, outflows from the system occur during large storm events, which results in flooding and the discharge of wastewater onto local streets, including streets in the McKinley Park area.

In 2015, the update to the City's Combined Sewer System Improvement Plan identified the project as one of several projects that would alleviate stresses on the combined sewer system by providing additional storage capacity, which would be utilized when the system approaches maximum capacity during large storm events. The purpose of the project is to improve the health and safety of residents of Sacramento by reducing flooding and wastewater outflows from the combined sewer system, while also meeting the requirements of the City's National Pollutant Discharge Elimination System

---

[2] The mandamus petition was filed against the City and the City Council of the City of Sacramento. Consistent with the allegations in the petition, we collectively refer to the defendants as "the City" in resolving the claims raised in this appeal.

2

(NPDES) permit, which places limits on the discharge of pollutants from the combined sewer system.

The project is located in McKinley Park, a 32-acre neighborhood park in East Sacramento. It is bounded by residential streets and supports a variety of recreational and community activities. The park includes jogging paths, tennis courts, a pool, a rose garden, a pond, picnic areas, ball fields, horseshoe pits, playgrounds, a library, and a community center.

The project involves the installation of a large concrete vault underneath the existing baseball field at McKinley Park, as well as inlet and outlet pipes, a weir structure, flow control valves, an odor control system, electrical controls, and other necessary appurtenant facilities. After the vault and its related components are installed, the project calls for, among other things, the replanting of any removed trees, the planting of 60 new trees, and the construction of a new baseball field or a multi-purpose sports field. The construction of the project was scheduled to occur over a period of approximately two years.

The draft EIR for the project was published in April 2018, with a 45-day public review period. In September 2018, the final EIR was published. It includes responses to all comments received on the draft EIR as well as 10 "Master Responses" addressing specific topics. The final EIR also includes updated information about the design of the project based on newly completed 90 percent design drawings, which showed that the project's construction footprint would be smaller than the maximum size analyzed in the draft EIR. In October 2018, the City approved the project, certified the EIR, and adopted a mitigation monitoring and reporting program.

In November 2018, Citizens filed the instant mandamus petition, alleging a number of claims. As relevant here, Citizens claims CEQA was violated because (1) the EIR failed to adequately analyze various environmental impacts of the project, (2) the EIR failed to analyze a reasonable range of alternatives to the project, and (3) the City

3

failed to recirculate the EIR after significant new information was added following the public review period.

In October 2019, the trial court denied the mandamus petition in a lengthy written ruling. Although the notice of appeal was timely filed on November 1, 2019, the record was not filed until September 3, 2020. The case was fully briefed on February 23, 2021; the parties requested argument and the case was heard and submitted on September 27, 2021.

## DISCUSSION

### I

### *Standard of Review*

In a mandamus proceeding to review an agency's compliance with CEQA, we review the administrative record to determine whether the agency prejudicially abused its discretion. (*Chico Advocates for a Responsible Economy v. City of Chico* (2019) 40 Cal.App.5th 839, 845; § 21168.5.) An agency may abuse its discretion under CEQA by failing to proceed in the manner required by law or by reaching factual conclusions unsupported by substantial evidence. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard Area Citizens*); § 21168.5.) Judicial review of these two types of errors differs significantly. (*Vineyard Area Citizens,* at p. 435.) Where the claim is predominantly one of improper procedure, we determine de novo whether the agency employed the correct procedures, scrupulously enforcing all legislatively mandated requirements. (*Ibid*.)

Where the claim is predominately a dispute over the facts, we review for substantial evidence, according deference to the agency's factual conclusions. (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 435; see *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 653-654 [the substantial evidence standard applies to the EIR's conclusions, findings and determinations, as well as challenges to the scope of an EIR's analysis of a topic, the methodology used for

4

studying an impact and the reliability or accuracy of the data upon which the EIR relied].)
The CEQA Guidelines[3] define "substantial evidence" as "enough relevant information
and reasonable inferences from this information that a fair argument can be made to
support a conclusion, even though other conclusions might also be reached." (CEQA
Guidelines, § 15384, subd. (a); see § 21082.2, subd. (c) [substantial evidence includes
facts, reasonable assumptions predicated upon facts, and expert opinion supported by
facts; it does not include argument, speculation, unsubstantiated opinion or narrative,
evidence which is clearly inaccurate or erroneous, or evidence of social or economic
impacts which do not contribute to, or are not caused by, physical impacts on the
environment].)

" 'As with all substantial evidence challenges, an appellant challenging an EIR for
insufficient evidence must lay out the evidence favorable to the other side and show why
it is lacking. Failure to do so is fatal. A reviewing court will not independently review
the record to make up for appellant's failure to carry his burden.' " (*South County
Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 328.)

In applying the substantial evidence standard to an action to set aside an agency's
decision under CEQA, we resolve reasonable doubts in favor of the agency's decision.
(*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47
Cal.3d 376, 393.) "A court may not set aside an agency's approval of an EIR on the
ground that an opposite conclusion would have been equally or more reasonable.
[Citation A court's task is not to weigh conflicting evidence and determine who has the
better argument when the dispute is whether adverse effects have been mitigated or could
be better mitigated. . . . Our limited function is consistent with the principle that 'The

---

[3] The regulations implementing CEQA are codified at California Code of Regulations,
title 14, section 15000 et seq. and are called the State CEQA Guidelines (14 Cal Code
Regs., tit. 14, § 15001). We shall refer to them as the CEQA Guidelines.

purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind.  CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' " (*Ibid*.)

" 'An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citation.]  'When assessing the legal sufficiency of an EIR, the reviewing court focuses on adequacy, completeness and good faith effort at full disclosure.' [Citation.]  Although CEQA 'requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive.' [Citation.]  Therefore, noncompliance with CEQA's information disclosure requirements is not necessarily reversible; *prejudice* must be shown.  [Citations.]  '[A] prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the goals of the EIR process.' [Citation.]  In such event, the error is deemed prejudicial 'regardless whether a different outcome would have resulted if the public agency had complied with the disclosure requirements.' " (*San Joaquin Raptor Rescue Center v. County of Merced*, *supra*, 149 Cal.App.4th at p. 653.)

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's:  The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.  [Citations.]  We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [City] and whether it contains substantial evidence to support the [City's] factual determinations." (*Vineyard Area Citizens*, *supra*, 40 Cal.4th at p. 427.)

6

II

*Adequacy of the EIR's Environmental Impacts Analysis*

Citizens contends the EIR violated CEQA by failing to adequately analyze various environmental impacts of the project. We discuss each of the claims in turn below. As we shall explain, we find no basis for reversal.

A. *Generally Applicable Legal Principles*

At the "heart of CEQA" is the requirement that a public agency prepare an EIR whenever the agency proposes to approve or carry out a project that may have a significant effect on the environment. (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 944 (*San Mateo Gardens*).) "The purpose of the EIR is 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citation.] The EIR thus works to 'inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made,' thereby protecting ' "not only the environment but also informed self-government." ' " (*Ibid.*)

"Under CEQA and its implementing guidelines, an agency generally conducts an initial study to determine 'if the project may have a significant effect on the environment.' [Citation.] If there is substantial evidence that the project may have a significant effect on the environment, then the agency must prepare and certify an EIR before approving the project." (*San Mateo Gardens, supra,* 1 Cal.5th at p. 945.)

"Before the impacts of a project can be assessed and mitigation measures considered, an EIR must describe the existing environment. It is only against this baseline that any significant environmental effects can be determined." (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 952; CEQA Guidelines, § 15125, subd. (a).) "The description of the environmental setting shall be no

7

longer than is necessary to provide an understanding of the significant effects of the proposed project and its alternatives.  The purpose of this requirement is to give the public and decision makers the most accurate and understandable picture practically possible of the project's likely near-term and long-term impacts."  (CEQA Guidelines, § 15125, subd. (a).)

An EIR must adequately identify and analyze each significant effect on the environment that may result from the project (§ 21100, subds. (a), (b); CEQA Guidelines, §§ 15126.2, subd. (a), 15143).  " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment."  (§ 21068.)  " 'Environment' means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance."  (§ 21060.5.)  An EIR must clearly identify and describe the direct and indirect significant effects of the project on the environment, giving due consideration to both the short-term and long-term effects.  (CEQA Guidelines, § 15126.2, subd. (a).)

Once an EIR has identified a significant effect on the environment, it must propose and describe mitigation measures for that effect.  (§§ 21002.1, subd. (a), 21100, subd. (b); CEQA Guidelines, §§ 15121, subd. (a), 15126.4, subd. (a).)  A mitigation measure is an action that minimizes, reduces, or avoids a significant environmental effect or that rectifies or compensates for the effect.  (CEQA Guidelines, § 15370.)

Under CEQA, an agency's role is to make ultimate findings as to whether potential environmental effects will be significant and to adopt feasible mitigation measures.  (*King & Gardiner Farms, LLC. v. County of Kern* (2020) 45 Cal.App.5th 814, 852.)  Generally, an agency must adopt feasible mitigation measures to reduce the identified significant environmental effects to insignificance.  (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 231; see *Banning*

*Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1233 [the goal of mitigation measures is to reduce environmental effects to insignificant levels].)

An EIR is presumed legally adequate, and the party challenging the EIR has the burden of proving otherwise. (*Chico Advocates for a Responsible Economy v. City of Chico*, *supra*, 40 Cal.App.5th at p. 846.)

B.  *Impact of the Project on Trees*

Citizens contends the EIR is deficient because it contains virtually no analysis of how construction activities may damage or destroy dozens of trees at the project site. According to Citizens, the EIR is inadequate because it fails to:  (1) consider how construction activities may adversely impact all trees at the project site, not just the trees to be removed; (2) evaluate the impacts to trees caused by construction vehicles entering and leaving the project site, including the impact from construction vehicles compacting soil above the roots of trees; and (3) analyze the impacts to trees caused by placing or storing construction equipment or material at the project site.

1.  *Additional Background*

The draft EIR explained that approximately 129 trees were surveyed within the proposed project area, that those trees are generally located on the periphery of the work area and along access paths, and that the project was designed to avoid the removal and/or pruning of trees in accordance with Sacramento City Code 12.56 (Tree Ordinance), with the assistance of a report from an arborist.  The draft EIR stated, "Figure 2.4-2 illustrates the trees surveyed and their identified driplines [or protection zones] to be avoided to the extent feasible."

The Tree Ordinance requires the issuance of a tree permit prior to any "regulated work" on a city tree, which includes any tree located in a city park that is four and one-half feet above ground.  Among other things, regulated work includes the removal of a city tree, pruning the branches of or roots from a city tree, grading, clearing, excavating, adding till soil, trenching, boring, compacting, or paving within a city tree's protection

9

zone (i.e., the area around a tree within the outermost circumference of canopy or as set forth in a tree protection plan), and the placing or storing of construction equipment or construction material within a city tree's protection zone. A tree permit will be issued if the applicant establishes the need for the proposed work, that any detriment to the city tree population entailed by the proposed work is justified and, in the case of tree removal, the applicant submits an acceptable tree replacement plan. As a general matter, the City must obtain approval from the Director of the City Parks Department and the City Council prior to the removal of any city tree as part of a public project that otherwise requires City Council approval. Per the Tree Ordinance: "Whenever feasible, the city shall modify the design of public projects to avoid the removal or damage to city trees."

The draft EIR explained that the vault was designed to fit below the open area of the existing baseball field at McKinley Park to reduce the impact to trees within the park, and that the majority of construction activities would take place near the baseball field adjacent to 33rd Street. The draft EIR stated that the vault would have a "constructed maximum footprint of 300-feet wide by 350-feet long," and may "require temporary excavation beyond the footprint of the facility to allow for safety measures such as shoring and construction equipment access," but that "temporary construction activities would be designed to limit activity within the drip-line [i.e., protection zone] of the nearby trees." The draft EIR further stated that a limited amount of trees may need to be removed and/or trimmed to accommodate the movement of large construction equipment, and that access to the project site would likely require work within the dripline of trees, but that no tree removal was required to accommodate the construction or operation of permanent project features. The draft EIR noted that tree removal was not anticipated, but that if any trees needed to be removed, it would be accomplished in accordance with the Tree Ordinance, and similar trees would be planted to replace the removed trees.

The draft EIR identified two potential access points to the project site along existing maintenance roads and a construction-related staging area, which is located

where access routes are the shortest.  The draft EIR explained that the staging area would be approximately one acre in size, and that its location was selected to avoid impacts on trees and other park facilities.  The draft EIR concluded that any impacts to trees from the project would be less than significant as a result of compliance with the Tree Ordinance and mitigation measures, including a mitigation measure that limits overall tree removal and provides for the revegetation of the project area upon completion of construction activities.[4]  Additional mitigation measures identified in the draft EIR to limit the impacts to trees include:  retaining an arborist for the project, ensuring that tree protection measures are written into construction specifications, limiting access routes to the project when feasible, erecting fencing and signage around trees to be preserved, avoiding damage to tree trunks and crowns during construction, avoiding excessive soil compaction and additional fill dirt, unless permitted, and ensuring that an arborist is on site during tree removal, trenching, and/or digging to prevent root loss, root damage, structural damage, and to maintain tree and soil health.

The final EIR stated, "Since publication of the [draft] EIR, the proposed Project has been further refined in the 90% design drawings and would require the removal of four trees for construction of the proposed Project. . . .  As discussed in the Project Description of the [draft] EIR, tree removals would be limited to the greatest extent feasible and other remedial actions (e.g., trimming and protective measures) would be considered prior to determining a tree must be removed.  The number of trees identified for removal could change slightly during the final design drawings but would not exceed a total of six trees.  The analysis of the [draft] EIR considered the need for potential tree removal and assessed existing conditions in the Project area through identification and disclosure of the 129 trees," as shown in Figure 2.4-2.  The final EIR concluded that the

---

[4]  The draft EIR explained that, "The proposed Project would obtain a tree permit prior to construction, . . . which would ensure the City follows the adopted tree ordinance."

11

draft EIR "is adequate for the analysis regarding tree impacts of the proposed Project because all trees within McKinley Park are subject to the City Tree Ordinance and the City is responsible for maintaining the park, including the trees. Based on the City Tree Ordinance, the proposed Project would result in a less than significant impact to tree resources given the bulk of the impacts (i.e., tree trimming and work within the tree root zones) would be temporary, limited to trees within or immediately adjacent to the temporary work area, and would be in compliance with the City's Tree Ordinance as required with the mitigation measures described in the [draft] EIR . . . ." The final EIR stated that any removed trees would be replanted and that approximately 60 new trees would be planted.

### 2. *Analysis*

We conclude Citizens has failed to carry its burden to show that the EIR's tree impact analysis is deficient. The EIR is adequate to provide for informed decision-making and informed public participation.

Citizens relies heavily on *Lotus v. Department of Transportation* (2014) 223 Cal.App.4th 645, which involved the adequacy of an EIR analyzing a proposed highway expansion project adjacent to old-growth redwood trees in a state park. (*Id*. at pp. 647-648.) In *Lotus*, the primary environmental impacts resulting from the proposed project were tree removal and potential damage to the structural root zones of trees caused by, among other things, excavation and placement of impervious material or fill over the roots. (*Id*. at p. 649.) The *Lotus* court held that the EIR prepared by Caltrans did not comply with CEQA because it failed to evaluate the significance of the project's impact on the root systems of old growth redwood trees. (*Id*. at p. 658.) In so holding, the court noted that the EIR disclosed that the project activity would "take place within the root zones of specific old growth redwood trees" and would also result in changes to the "impermeable area covering the root zones of some of the old growth redwood trees." (*Id*. at p. 654) The EIR, however, "did not include any information that enables the

12

reader to evaluate the significance of these impacts." (*Ibid*.) The appellants in that case argued that the proper measure of significance was found in a publication by another agency, but the "EIR itself[did] not reference the handbook or apply the standards it prescribes to evaluate impacts to the old growth redwoods that may be expected to result from the highway construction." (*Id*. at p. 655.)

The error by Caltrans was its failure to adopt any standard for determining whether the planned project would have significant effects on old growth redwood trees: "[T]he EIR fails to identify any standard of significance, much less to apply one to an analysis of predictable impacts from the project." (*Lotus v. Department of Transportation, supra,* 223 Cal.App.4th at p. at p. 655.) *Lotus* characterized the EIR's failure to separately identify and analyze the significance of the impacts to the root zones of old growth redwood trees before proposing mitigation measure as a "structural deficiency," a shortcut that "subverts the purposes of CEQA by omitting material necessary to informed decisionmaking and informed public participation. It precludes both identification of potential environmental consequences arising from the project and also thoughtful analysis of the sufficiency of measures to mitigate those consequences. The deficiency cannot be considered harmless." (*Lotus,* at p. 659.)

Here, unlike the situation in *Lotus*, there is nothing in the record indicating that excavation will take place within the structural root zones of any city tree or that construction-related activities will result in a significant impact to the area encompassing the structural root zones of any city tree. The record does not reflect that the construction staging area is located within a city tree's dripline (i.e., protection zone) or that construction materials or fill will be placed in such a zone. Rather, the EIR disclosed that the project was designed to fit below the existing open baseball field, whereas most of the trees in McKinley Park are located within or adjacent to the temporary work area (i.e., outside the project work area) and along existing access paths, as depicted in Figure 2.4-2 (Trees Surveyed) of the draft EIR and the 90 percent design drawings included in the

13

final EIR. The EIR further disclosed that the project site would be accessed via an existing maintenance road, that the construction staging areas are located in areas that would avoid impacts to trees, and that tree protection fencing would be placed around trees at the project site, as depicted in the 90 percent drawings. The EIR identified tree trimming and temporary work within the dripline (or tree protection zone) of trees within or immediately adjacent to the temporary work area, and tree removal (up to six trees as shown in the 90 percent drawings), as impacts arising from the project, but concluded that these impacts would be less than significant with mitigation measures, including compliance with the Tree Ordinance (i.e., the threshold of significance). In short, this case bears little resemblance to *Lotus*. The EIR here does not involve the deficiencies discussed in that case. Nor does this case involve the deficiency discussed in *East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, as Citizens claims. (See *id*. at pp. 287, 301-303 [EIR deficient where it concluded that traffic impacts would be less than significant based *solely* on compliance with the mobility element in the City's general plan (which permitted congested traffic conditions within the core area of the City), without any evidence that such impacts were insignificant; "[T]he fact that a particular environmental effect meets a particular threshold cannot be used as an automatic determinant that the effect is or is not significant."].)

C. *Impact of the Project on an Historic Resource*

Citizens contends the City violated CEQA because it failed to analyze the impacts of the project on McKinley Park as an historic resource until the release of the final EIR, which deprived the public and responsible agencies of a meaningful opportunity to comment on this issue. Citizens further contends that, even if it were proper for the City to analyze the project's impacts on an historic resource for the first time in the final EIR, substantial evidence does not support the final EIR's conclusion that the project would be

14

consistent with the Secretary of Interior's Standards for Rehabilitation. We disagree on both points.

### 1. *Applicable Legal Principles*

"Historic resources are accorded special protection under CEQA, and the state must 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state' including the protection and rehabilitation of 'objects of historic or aesthetic significance.' " (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1065.) Under CEQA, an "historical resource" includes, as relevant here, any "site, area, [or] place . . . which is historically or archaeologically significant, or is significant in the architectural, engineering, scientific, economic, agricultural, educational, social, political, military, or cultural annals of California." (§ 5020.1, subd. (j).)

Once a site, area, or place has been listed in the National Register of Historic Places as authorized by the National Historic Preservation Act (16 U.S.C. § 470 et seq.), it is automatically listed in the California Register of Historical Resources (§ 5024.1, subd. (d)(1); CEQA Guidelines, § 4851, subd. (a)(1)) and thus became a "historical resource" for purposes of CEQA. (§ 21084.1 [defining "an historical resource" as a "resource listed in, or determined to be eligible for listing in, the California Register of Historical Resources"].)

"A project with an effect that may cause a substantial adverse change in the significance of an historical resource is a project that may have a significant effect on the environment. [¶] (1) Substantial adverse change in the significance of an historical resource means physical demolition, destruction, relocation, or alteration of the resource or its immediate surroundings such that the significance of an historical resource would be materially impaired." (CEQA Guidelines, § 15064.5, subd. (b)(1); see § 5020.1, subd. (q) [" 'Substantial adverse change' means demolition, destruction, relocation, or alteration such that the significance of an historical resource would be impaired."].) "The

15

significance of an historical resource is materially impaired when a project: [¶] Demolishes or materially alters in an adverse manner those physical characteristics of an historical resource that convey its historical significance and that justify its inclusion in, or eligibility for, the California Register of Historical Resources." (CEQA Guidelines, § 15064.5, subd. (b)(2)(A).)

The Secretary of Interior's Standards are "the benchmark that CEQA uses to establish whether a project will have a significant adverse impact to a historic property. [CEQA] Guidelines section 15064.5, subdivision (b)(3) reads as follows: 'Generally, a project that follows the [Secretary's Standards] shall be considered as mitigated to a level of less than a significant impact on the historical resource.' " (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco, supra,* 227 Cal.App.4th at p. 1066; see CEQA Guidelines, § 15064.5, subd. (b)(3).)

### 2. *Additional Background*

The draft EIR concluded that McKinley Park did not appear to be an historic resource for purposes of CEQA, but acknowledged that it had been *nominated* for inclusion in the National Register of Historic Places. The draft EIR explained that, if McKinley Park were found to be eligible for inclusion in the National Register by the State Historical Resources Commission, it would meet the definition of a historic resource under CEQA Guidelines section 15064.5. The draft EIR concluded that the project "would not cause a substantial adverse change in the significance of a historic resource as defined by [CEQA Guidelines] section 15064.5 and the Project would have a less than significant impact." In so concluding, the draft EIR determined that the project "would not cause a substantial adverse change in the significance of . . . McKinley Park since the park would maintain its existing uses once construction is finished and the historical context would be maintained."

The final EIR acknowledged that McKinley Park was determined to be eligible for listing in the National Register after the draft EIR was published, thus qualifying it as a

16

historic resource under CEQA, but concluded that this determination did not affect the adequacy of the cultural evaluation within the draft EIR. In so concluding, the final EIR provided a detailed analysis of why the project would not cause a substantial adverse change in the historic significance or integrity of McKinley Park (and therefore would have less than a significant impact on an historical resource) based on the Secretary of Interior's Standards for Rehabilitation. Following this analysis, the final EIR summarized its conclusions regarding the impact of the project on an historic resource: "[T]he [draft] EIR supports the conclusion that the proposed Project would adhere to the [Secretary's] Standards and Guidelines and no significant effect would occur. Most of Project would be below-ground and would have only a temporary disruption to the landscape's use. All contributing elements with the potential to be impacted - the baseball diamond and adjacent trees - would be treated in a way that is consistent with the [Secretary's] Standards. While the baseball diamond may be replaced with a soccer field or multi-purpose field or some combination of the two, this change does not constitute an adverse change to the Park's overall historical significance. As for the trees, . . . the City intends to preserve existing trees to the maximum extent possible and where the limited removal of trees is necessary, they would be replaced, and additional trees planted. For the proposed electrical and control equipment/restroom building the design would be compatible with the architectural vocabulary of McKinley Park and would be of an appropriate size and scale that would not detract from the relevant setting. All aspects of the proposed Project would be reversible, and no aspect of the essential form and integrity of the landscape would be impacted. Adherence of the proposed Project to the [Secretary's] Standards and Guidelines illustrated above ensures that impacts to cultural resources would be less than significant as disclosed in the [draft] EIR."

3. *Analysis*

Initially, we do not agree that the draft EIR was required to analyze the project's impacts on McKinley Park as an historic resource. At the time the draft EIR was published, McKinley Park had not been listed on a federal, state, or local register of historic landmarks or places. CEQA requires an EIR to "focus on impacts to the existing environment, not hypothetical situations." (*County of Amador v. El Dorado County Water Agency*, *supra*, 76 Cal.App.4th at p. 955.) "[T]he impacts of a proposed project are ordinarily to be compared to the actual environmental conditions existing at the time of [the] CEQA analysis . . . ." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 321; see CEQA Guidelines, § 15125, subd. (a)(1) [the environmental conditions existing at the time the environmental analysis is commenced (e.g., publication of the notice of preparation) normally constitute the baseline conditions by which an agency determines whether an impact is significant].)

Further, the record reflects that the public and responsible agencies were not deprived of a meaningful opportunity to comment on this issue, and substantial evidence supports the EIR's conclusion that the project's impacts on an historical resource would be less than significant. Citizens has failed to direct us to evidence in the record showing that McKinley Park's historical significance would be *materially* impaired by the project. (CEQA Guidelines, § 15064.5, subd. (b)(1).) Based on our review of the record, there is no substantial evidence that the project, if completed, would physically demolish, destroy, or alter in an adverse manner those characteristics of McKinley Park that convey its historical significance and justify its eligibility for listing in the California Register of Historical Resources. (See CEQA Guidelines, § 15064.5, subd. (b)(2)(A).) Citizens' arguments to the contrary are unpersuasive.

18

D. *Impact of the Project on Air Quality*

Citizens contends the EIR's analysis of air quality impacts on sensitive receptors is deficient because it is based on fundamentally flawed assumptions, and failed to account for: (1) two-way hauling trips, with idling time on each end; (2) the use of a single access point to the project as opposed to two access points; and (3) the larger project area identified in the final EIR. We disagree.

1. *Additional Background*

The draft EIR contained a detailed air quality analysis. It described the existing regulatory and environmental setting, and analyzed potential impacts of the project on air quality from construction-related activities at the project site and construction-related hauling and worker vehicle trips, including air quality impacts from equipment and vehicle emissions (e.g., carbon monoxide, nitrogen dioxide), particulate matter emissions, fugitive dust emissions, and odors. In concluding that the project would have a less than significant impact on air quality, the draft EIR used an emissions model (California Emissions Estimate Model (CalEEMod)) to determine that the estimated air emissions from the project would not exceed the thresholds for significance for criteria pollutants established by the Sacramento Metropolitan Air Quality Management District (SMAQMD), which is the primary agency responsible for meeting state and federal ambient air quality standards in Sacramento County. The draft EIR also explained that the City would require the selected contractor to prepare and implement a project Construction Emission and Dust Control Plan that complied with the SMAQMD rules and policies, which would limit impacts caused by increases in emission levels, including fugitive dust.

The draft EIR acknowledged that the project has the potential to expose sensitive receptors (i.e., children, pregnant women, elderly, persons with existing health problems) to substantial pollutant concentrations from construction generated emissions (fugitive dust and air emissions), and identified the nearest sensitive receptors in the vicinity of the

19

project, including park users, children at a daycare, residents of the area, children at a middle school, and students at a law school. The draft EIR, however, concluded that specific dust control measures would effectively limit emissions of fugitive dust from construction activities, thereby reducing the impact from dust to a less than significant level. The draft EIR also concluded that the temporary increase in air emission levels from the project (including increases in emissions caused by increased levels of traffic and construction-related hauling trips) would not pose a significant hazard to sensitive receptors because the emissions would not exceed the thresholds of significance for pollutants established by the SMAQMD.

2. *Analysis*

Citizens first claims the EIR is deficient because its analysis of air quality impacts fails to account for two-way trips with regard to the hauling of material off-site.

The draft EIR explained that construction of the project would cause a temporary increase in traffic volumes on streets near the project site, resulting in an increase in carbon dioxide emissions during construction. The draft EIR further explained: "The proposed Project would generate approximately 4,722 total hauling trips throughout Project construction. Although hauling and construction worker vehicle trips would cause a temporary increase in traffic during Project construction, these additional trips would not result in a significant increase to congestion on local roadways since construction traffic would be intermittent and staggered in timing from residential and other local traffic in the area. Therefore, the proposed Project would not have the potential to expose sensitive receptors to substantial concentrations of localized [carbon dioxide]."

In response to comments about the air quality analysis in the draft EIR, the final EIR provided the following explanation regarding construction-related hauling trips: "The distance to the haul site location . . . is approximately 1.5 miles away from the proposed Project site. At the time of [draft] EIR circulation several haul site locations

20

were being considered and as a conservative approach, the analysis assumed that haul trip lengths would be 10-miles. To account for round trips for hauling, the haul distance considered within the [draft] EIR was doubled to 20-miles, which has the same outcome as doubling the trip count. The material import, including concrete trucks and capacity, were factored into the air quality analysis with the 150-vehicle maximum daily worker trips and was accounted for in the overestimation of the hauling trip length . . . . The assumptions for worker and hauling trips changed as the Project evolved. The trips modelled under the heading of vendor and worker trips was lower than was disclosed in . . . the [draft] EIR; however, this under estimation doesn't surmount to a significant change in model results since the overestimation of hauling miles also accounts for the difference equivalently calculating an accurate estimate of total vehicle trips, despite differences in classifications. Additionally, Project details were rerun with the newer version of [the] CalEEMod including the revised inputs reflecting the more refined concrete truck, vendor, and worker trips estimates and hauling trip lengths . . . resulting in emission estimates that are similar and slightly lower than the original results and still below the SMAQMD significance thresholds."

We conclude that Citizens has failed to carry its burden to show that the EIR inadequately analyzed the project's air quality impacts with respect to construction-related hauling trips. The record contains substantial evidence supporting the EIR's conclusion that the increase in emissions from hauling trips would be less than significant.

We also reject Citizens' contention that the draft EIR's analysis of air quality impacts was deficient due to the subsequent reduction from two to one project access point. The draft EIR identified two *proposed alternative* access routes (McKinley Boulevard and 33rd Street), stated that access routes would be established during site preparation, and contemplated limiting access routes "when feasible" to mitigate impacts to trees. While the final EIR identified only one access route to the project site (i.e., the

21

shorter access route from 33rd Street), Citizens has not carried its burden to demonstrate that the EIR's air quality analysis is inadequate because it is based on the "false assumption" that construction traffic would be divided between the two proposed access points. Citizens cites no evidence and offers no reasoned argument showing that substantial evidence does not support the EIR's conclusion that the project's impacts on air quality would be less than significant, regardless of the ultimate decision on the access points.

Finally, we reject Citizens' contention that the draft EIR's analysis of air quality impacts was deficient because the final EIR showed a larger project work area than analyzed in the draft EIR, with no updated analysis of the air quality impacts. Citizens does not cite any portion of the final EIR to support its vague contention that the final EIR shows a "far larger" project work area. Instead, it directs us to a portion of the comment letter it submitted in response to the draft EIR, which states, in relevant part, "The 90% Plans show that the Project impact area will occur less than 20 feet north of the Tiny Tots Daycare. This is much closer than what was characterized in the Draft EIR. Yet the Master Response provides no analysis of the Localized Significance Thresholds for this substantial change, and makes no effort to mitigate the impacts to the children who will be exposed to idling trucks daily for over 2 years." As the City points out, the final EIR explained that the project footprint was *reduced* in size from a maximum footprint of 300-feet wide by 350-feet long, with a maximum depth of 37-feet, to 300-feet wide by 240-feet long, with a depth of 20-feet. The City concedes that the final EIR depicts a "modestly larger" construction staging area than the proposed staging area in the draft EIR. However, Citizens has not carried its burden to show that the EIR's discussion of the project's air quality impacts was deficient in failing to analyze the impact (if any) from this change to the project's staging area.

22

E. *Impact of the Project on Traffic and Transportation*

Citizens contends the EIR's analysis of the project's impacts on traffic and transportation is deficient because it is based on "materially false assumptions," particularly the erroneous assumption that the project site would have the two access points identified in the draft EIR (McKinley Boulevard and 33rd Street). According to Citizens, the final EIR's selection of a single access point (33rd Street) shows that the draft EIR's analysis about traffic impacts near the project site is inaccurate, rendering its conclusions about the significance of traffic impacts unsupported by substantial evidence. Citizens additionally contends the EIR is deficient because it fails to evaluate traffic impacts that may be caused by residents living on certain streets near the project site. We disagree.

1. *Additional Background*

The draft EIR described the regulatory and environmental setting for transportation and traffic, and explained the methodology used to determine whether the project's impacts on traffic and transportation near the project site would be significant, including use of the CEQA Guidelines Appendix G checklist and the Level of Service (LOS) method.[5] In concluding that the impacts from the project would be less than significant with mitigation, the draft EIR explained: "During construction, the proposed Project would generate construction traffic, including worker automobile and light truck trips, haul truck trips during excavation, and trucks delivering or removing materials during construction such as concrete or excavated dirt. The maximum construction

---

[5] The LOS method has a scale of A to F. LOS A is free flowing traffic and LOS F is congested, "stop and go" traffic. (*East Sacramento Partnerships for a Livable City v. City of Sacramento*, *supra*, 5 Cal.App.5th at p. 288.) The draft EIR identified the main streets surrounding the project site and provided the LOS thresholds for those streets as set forth in the City of Sacramento 2035 General Plan. For instance, both McKinley Boulevard and 33rd street are designated as LOS D roadways in the general plan.

traffic on any given day could consist of trips by up to 50-onsite workers and approximately 100- truck trips for delivering concrete or hauling away excavated dirt material. However, the average worker trips are anticipated to be closer to 10- to 20- workers/day and materials truck trips would be concentrated in short durations during excavation and concrete pouring phases of construction. The total maximum estimated daily trips from construction activities is anticipated to be approximately 150-vehicle trips or a maximum averaged over the 11 hour construction window (from seven am to six pm) approximately 14 additional vehicle trips per hour. [¶] Although construction activities would introduce approximately 14 new roadway users per hour to nearby roadways during construction hours (from seven am to six pm), McKinley Park visitors that drive to the park during these same construction hours would likely decrease slightly during construction due to opting to recreate in other locations . . . . If this decrease in recreational users were to occur, it would help offset the introduction of the maximum of 150-construction traffic trips per day in the vicinity of the proposed Project. However, while a slight decrease in park visitors may offset some construction traffic, and daily construction trips would be limited to minimal for the majority of the two year construction period, construction traffic would still likely pose a minor to moderate change to traffic conditions in the immediate proposed Project area during the concentrated phases of construction. Alhambra Boulevard, J Street, E Street, 33rd Street, and McKinley Boulevard would serve as the main access points for construction traffic from the freeway and would experience the majority of construction traffic impacts including any delays or increases in traffic congestion if they were to occur. To quantify the extent of potential impacts, peak evening hours would see increases of 24 trucks to the approximately 554 vehicles that currently use McKinley Boulevard during the peak evening hours . . . . As such, construction of the proposed Project would not substantially alter the existing traffic flows or LOS of the nearby roadways."

The draft EIR also explained, in addition to the total estimated daily maximum 150-vehicle trips, "[a]dditional queuing could occur along 33rd Street and McKinley Boulevard. These trips and additional vehicles on the surrounding roadway could slightly increase traffic by placing new vehicles on roadways that provide access to the proposed Project site with the highest levels of construction related traffic being expected during normal work hours from seven a.m. to six p.m. and during the excavation activities. However, the increase in traffic would not be significant because these additional vehicle trips are below the vehicle trip generation criteria set by the City of Sacramento 2035 General Plan . . . . [¶] During evening peak flows, traffic on McKinley Boulevard would have 24 trucks added to the existing 554 vehicles. These additional vehicle trips are not anticipated to affect the LOS standards . . . on these roadways or significantly increase local traffic congestion since . . . the trips would be concentrated around the construction activities associated with excavation and concrete pouring. . . . [C]onstruction vehicles would likely use 33rd Street and McKinley Boulevard/E Street to access Interstate Business 80 when transporting materials but may also use freeway access from J Street. [A mitigation measure] would establish a traffic control plan to coordinate and direct traffic controls in the least impactful way possible ensuring construction related traffic impacts remain at a less than significant level pursuant to this City code since controls to properly inform the public and controls construction traffic flows ensuring temporary construction impacts remain less than significant."

2. *Analysis*

We find no merit in Citizens' contention that the EIR's transportation and traffic impact analysis is deficient. The record discloses substantial evidence supporting the EIR's conclusion that the project's impacts on traffic would be less than significant with mitigation. As we have discussed *ante*, the draft EIR identified two *proposed alternative* access routes to the project site (McKinley Boulevard and 33rd Street), and Citizens has not pointed to anything in the record supporting its contention that the draft EIR's

25

transportation and traffic impact analysis is deficient because it is based on the erroneous assumption that the project site would have two access points instead of the single access point identified in the final EIR (33rd Street). Indeed, as we have noted, the draft EIR contemplated limiting access routes to the project site to avoid significant impacts to trees.

Equally without merit is Citizens' conclusory contention that the draft EIR is inadequate for failing to "evaluate the impacts that may be caused by residents of Park Way and 33rd Street being forced to use the intersection at 33rd Street and H Street for both ingress and egress to their homes." The draft EIR stated, "Park Way and 33rd Street may experience temporary partial closures from installation of Project features within the roadway, parking restrictions, or construction site access; however, residential access would be maintained throughout construction for all road closures as required by [implementation of a traffic and pedestrian control plan]." Thus, the record reflects that the draft EIR considered the traffic impacts from temporary partial road closures in determining that the project would have less than a significant impact on traffic with mitigation. Citizens cites no evidence and offers no reasoned argument showing the EIR is deficient in this regard.

F. *Impact of the Project on Noise and Vibration*

Citizens contends the EIR is deficient because it failed to adequately analyze noise and vibration impacts with respect to children at the nearby Tiny Tot Daycare. Citizens additionally contends the EIR is deficient because it failed to adequately analyze the noise and vibration impacts with respect to residences on 33rd Street, including older or historic residences. We disagree.

1. *Additional Background*

The draft EIR described the environmental and regulatory setting for noise and vibration (including the City of Sacramento 2035 General Plan's exterior incremental noise impact standards for various noise-sensitive uses and vibration guidelines criteria

26

suggested by Caltrans), and explained the methodology used to determine whether the project's impacts on noise and vibration levels would be significant, including the use of CEQA Guidelines' Appendix G Environmental Checklist and a federal roadway construction noise model.

In concluding that the project would have less than a significant impact on noise levels, the draft EIR explained: "Sensitive receptors in the proposed Project area (as close as 25-feet) may experience temporary interference with speech during the day in the Project area during construction. However, the change in the existing ambient noise level of approximately 70 dBA,[6] to an approximate maximum of 89.7 dBA at 25-feet would be similar to the noise level of an ambulance siren 100-feet away . . . . A more typical noise level for Project construction activities would be the equivalent of the noise level of a freeway or busy traffic at 100-feet away. These construction activities [i.e., operation of a chain saw, backhoe, excavator, front end loader, and dump truck] are not anticipated to all occur concurrently on a regulator basis and would be limited to weekdays during daytime hours (seven am to six pm) and would also be limited to the approximate two-year duration of construction. Construction activities would occur in sporadic intervals with periods of construction start-up activities followed by quieter periods, thus limiting temporary exposure periods to clustered events during heavy construction activities that would not be sustained during the entire two-year duration of construction." (Footnote added.)

---

**6** "dB," or decibel, is a "unit of measurement of sound level." "dBA," or decibel A-Weighted, is a decibel "corrected to the A-weighted scale." An "A-weighted scale" is "[a] sound measurement scale, which corrects the pressures of individual frequencies according to human sensitivities. The scale is based upon the fact that the region of highest sensitivity for the average ear is between 2,000 and 4,000 Hz. Sound levels are measured on a logarithmic scale in decibels, dB. The universal measure for environmental sound is the A-weighted sound level, dBA."

The draft EIR further explained: "Following the general rule that a 10-dB increase in sound is perceived as a doubling of loudness by the human ear, Project construction would equate to more than double the perceivable sound level above ambient conditions. Construction activities would be limited to daytime hours . . . pursuant to the City of Sacramento Noise Ordinance Section 8.68.080.D and would be temporary lasting intermittently for the duration of the two-year construction period. These sound levels would be above the ambient level of 70 dBA for neighborhood parks, as shown in Table 3.10-4, and when equipment is in operation would be a noticeable deviation from ambient conditions for receptors surrounding the construction activities. While most receptors are further than 25-feet away from construction activities construction noise would be a temporary impact. Therefore, sound level increases to levels such as these are typical for the Project area and would not constitute a significant impact to speech within McKinley Park." The draft EIR additionally noted that, pursuant to the City's Noise Ordinance, the maximum allowable noise exposure standards identified in Table 3.10-4 do not apply to the project's construction-related activities, so long as the activities occur during specified daytime hours. The draft EIR explained that this exemption is typical of City and County noise ordinances and reflects the recognition that construction-related noise is temporary in character, is generally acceptable when limited to daytime hours, and is part of what residents experience as part of a typical urban area noise environment. The draft EIR also noted that "if construction were to be required outside of exempt hours, construction activities would be subject to the Noise Ordinance which would ensure non-daytime sound levels are kept to less than significant levels."

In concluding that the impacts from vibration would be less than significant, the draft EIR explained: "During construction of the proposed Project, equipment such as excavators, loaders, backhoes, and loaded trucks would be used. Construction activities within the Park would be approximately 50- to 100-feet from the closest residences.

28

Whereas during installation of the pipeline in 33rd Street, construction activities could be as close as 25-feet to residences. Construction equipment that would be used during Project construction would generate vibration levels between 0.001 and 0.27 peak particle velocity (PPV). [¶] For the pipeline installation, vibration levels could have a maximum range of 0.003 to 0.210 from use of the vibratory compactor/roller. According to levels provided in Table 3.10-10, the groundborne vibration from the vibratory compactor could be considered severe at times (see Table 3.10-7); however, this equipment would be used a limited amount as construction activities are being completed and is used to compact soils once the Project is constructed. The use of the compactor is anticipated to last a short period of time (approximately one month). [¶] . . . [¶] Due to the short time period, it is not anticipated that vibration impacts from the vibratory compactor would be significant. All other vibratory impacts would be below the distinctly perceptible range (See Table 3.10-7). In addition, construction activities would occur in phases, thereby reducing potential impacts from vibrations. The vibration damage potential is defined in Table 3.10-8. Some of the residences located along 33rd Street could be considered older residential structures or in some cases historic buildings and could be more susceptible to vibration impacts. Vibration levels generated by the Project (See Table 3.10-10) would be below the vibration damage potential thresholds, as shown in Table 3.10-8 and therefore, the proposed Project would not have the potential to significantly expose these structures to construction related groundborne vibration impacts."

In response to comments regarding noise and vibration, the final EIR stated: "In . . . the [draft] EIR, sensitive receptors were identified as including adjacent homes, schools, parks, and commercial businesses. Sensitive receptors, including the Tiny Tots daycare facility were identified within the Project area and specific noise levels at receptor distances are included in Table 3.10-9 [of the draft EIR]. The Tiny Tots Daycare facility would therefore be included in the sound level at receptor distance at 25

29

feet . . . . The noise and vibration discussion in the [project impact analysis section of draft] EIR . . . apply to the Tiny Tots daycare facility and no further analysis is required."

The final EIR also stated that the draft EIR listed the various PPV levels (i.e., vibration levels) that may result in potential damage to historic buildings, and analyzed vibration impacts to historic buildings from construction of the vault and the pipeline construction activities that would occur within 33rd Street. The final EIR then explained: "As stated in the [draft] EIR, during construction, the homes along 33rd street would be approximately 25-feet away from pipeline construction activities within 33rd Street and 50- to 100-feet away from McKinley Water Vault construction activities. As described in the [draft] EIR, neither of these construction areas would exceed the maximum 0.25 PPV damage criteria threshold outlined in Table 3.10-8. Homes along 33rd Street have withstood vibration associated with previous utility and roadwork activities similar to those that would be generated by the proposed Project associated with work in 33rd Street. As referenced in this section of the [draft] EIR, the Caltrans Transportation and Construction Vibration Guidance Manual was used to classify and assess vibration impacts and the damage associated with vibration impacts. Consistent with the [project impact] assessment . . . in the [draft] EIR, the homes along 33rd street are older residential structures, or in some cases historic buildings but are generally not considered fragile (due to being in bad condition or constructed out of poorly performing structural material such as stone masonry), further indicating the potential for excessive groundborne vibration at these residences is unlikely."

2. *Analysis*

The record discloses substantial evidence supporting the EIR's conclusion that the project would have less than significant impacts regarding noise and vibration. Contrary to Citizens' contention, the EIR considered and analyzed the project's noise and vibration impacts on sensitive receptors near the project site, including impacts to children attending the Tiny Tot Daycare, as well as the vibration impacts on historic homes along

30

33rd Street. We do not disagree that "the intent to comply with the noise ordinance does not constitute substantial evidence that noise impacts will be less than significant"; however, the EIR does not rely only on compliance with the noise ordinance to reach its less than significant impact conclusions, but merely notes that compliance in support of its conclusion. Finally, Citizens has not carried its burden to show that the EIR is deficient because it fails to evaluate the significance of impacts to residences on 33rd Street in view of the decision in the final EIR to select 33rd Street as the sole access point to the project site.

G. *Impact of the Project on Geology and Soils*

Citizens next contends the EIR is deficient because: (1) its conclusion that the project will cause no significant "liquefaction" impacts is not supported by substantial evidence; (2) its conclusions about landslide hazards are not supported by substantial evidence; and (3) the EIR does not include any mitigation measures to ensure that landslide risks are minimized. We are not persuaded.

1. *Additional Background*

The draft EIR described the local geology of McKinley Park and applicable regulations pertaining to geology and soil resources, and stated that, prior to construction of the project, a site specific geotechnical report would be prepared identifying the specific soil properties of McKinley Park. The draft EIR explained that, based on a federal soil survey for Sacramento, there are two different soils series within the proposed project site, and then discussed those soils, including drainage.

In the section titled, "Ground Failure, Liquefaction, and Landslides," the draft EIR explained: "Soil liquefaction occurs when ground shaking from an earthquake causes a sediment layer saturated with groundwater to lose strength and take on the characteristics of a fluid, thus becoming similar to quicksand. Factors determining the liquefaction potential are soil type, the level and duration of seismic ground motions, the type and

31

consistency of soils, and the depth to groundwater. Loose sands and peat deposits, along with recent Holocene age deposits, are more susceptible to liquefaction, while older deposits of clayey silts, silty clays, and clays deposited in freshwater environments are generally stable under the influence of seismic ground shaking. The Project site consists of well drained, coarse-loamy soils that have a low potential for liquefaction or ground failure to occur. However, the relatively shallow groundwater table and ground shaking that could occur from the surrounding earthquakes could increase the liquefaction potential in the Project area. Key design standards would be implemented in order to reduce the liquefaction potential and ensure structure stability. [¶] Landslides occur most frequently during or following large storms or earthquakes. Landslides are most likely to take place in areas where they have previously occurred. According to the CGS [California Geological Survey] Landslide Map, there are no potential areas for landslides or liquefaction within the proposed Project area (CGS 2015)."

Using the City of Sacramento 2035 General plan, the federal soil survey, CGS regulatory maps, the geotechnical interpretative report developed for the project area, and the CEQA Guidelines' Appendix G Environmental Checklist for guidance, the draft EIR concluded that the project would have less than significant impacts with respect to liquefaction and landslide hazards. In reaching its conclusions, the draft EIR stated: "The proposed Project is not located within a known liquefaction zone nor are there any fault zones near the Project area that could cause ground failure. The soils in the Project area are characterized as well-drained coarse-loamy soils that have a low potential for liquefaction to occur. Additionally, Project structures would be built in conformance with applicable building codes which include standards for preventing structure failure from earthquake related ground shaking. Therefore, the potential for the proposed Project to expose people or structures to potentially adverse effects related to liquefaction is considered less than significant."

The draft EIR further stated, "According to the CGS Landslide Inventory, no active landslide deposits have been identified in the proposed Project area which means that the potential for a landslide to occur in the area is low (CGS 2015). The Project site and the City itself are relatively flat and are not surrounded by any landmass features such as hills or mountains that would cause landslides. Therefore, the potential for landslides to occur as a result of the proposed Project would be less than significant."

In response to comments, the final EIR stated: "The [draft] EIR adequately evaluated environmental risks associated with geology and soils, project design incorporates appropriate design standards as required by law, limiting risk under varying soil conditions. Additionally, a site-specific geotechnical report, the Geotechnical Data Report, has since been conducted for the proposed Project and has been included as Appendix D of this [final] EIR. The results contained in the Geotechnical Data Report are consistent with and do not change the analysis or impact conclusions in the [draft] EIR." The final EIR further stated that the geotechnical report "included soil borings completed for the proposed Project site and gathered site-specific information of the soils in the Project area. From the borings at the proposed Project site, the soils in the area were found to be predominately sandy to sandy silt soils. This further supports the conclusions made in the [draft] EIR regarding liquefaction, landslides, and overall soil stability. Additionally, as stated in the [draft] EIR, key design standards would be implemented which would reduce the liquefaction potential and ensure structure stability."

2. *Analysis*

Although Citizens initially complains that the EIR is deficient because the draft EIR does not include a site-specific geotechnical report, it acknowledges that such a report is attached to the final EIR. Citizens fails to show how the EIR is deficient with the inclusion of this report. Citizens also faults the EIR for discussing soil conditions at a regional level rather than a site-specific level. However, the final EIR explained that site-

33

specific information of the soils in the project area was gathered via soil borings, as discussed in the geotechnical report. We are not persuaded by the remaining arguments raised by Citizens as to the adequacy of the EIR's analysis regarding geology and soils, which are conclusory in nature and do not show that the EIR is deficient.

H. *Impact of the Project as to Hazardous Materials*

We reject Citizens' initial contention that the EIR is deficient because it fails to evaluate the risks associated with storing sewage material beneath McKinley Park, including analyzing the impacts from a leak or overflow after a large storm event.

The draft EIR and final EIR make clear that the project would help alleviate existing combined sewer system flooding and wastewater outflows by providing additional underground storage that would only be used during large storm events (i.e., 10-year storm events), and that the vault would not store combined sewer system flows under typical conditions. The draft EIR explained: "As flows in the combined sewer system surrounding McKinley Park reach system capacity the offline storage facility [i.e., the vault] would become operational and would allow the flow from the combined system to flow into the [vault]. When storm flows subside and the combined sewer system has capacity, the flows can be gradually pumped back into the combined sewer system." The draft EIR further explained that the vault would only receive highly diluted combined sewage, and that it would be drained as soon as possible once capacity is available in the combined sewer system. The final EIR explained: "In the event of a storm with flows greater than a l0-year event . . . when the McKinley Water Vault reached capacity[,] overflows would occur in a manner similar to current experience but resulting flood levels would be reduced by the additional storage capacity of the McKinley Water Vault. Any flooding within the area would be reduced with the introduction of the McKinley Water Vault, with more manageable flows throughout the McKinley Park area." The draft EIR and final EIR also explained that construction of the vault would comply with federal and state building code standards, routine maintenance

34

would monitor for structural integrity of the vault, and the installation of electrical equipment would allow for remote operation and monitoring of the vault. The draft EIR also described regular cleaning and inspection requirements.

Citizens has failed to carry its burden to show that the EIR's hazardous materials analysis is inadequate. As we have set forth above, the EIR addressed these concerns and described a temporary and well-maintained storage facility that, even if overwhelmed by the weather, will serve to reduce flooding and sewage overflows. Citizens has failed to demonstrate that the EIR is deficient for failing to consider the impacts from a leak in the vault or the inlet and outlet pipelines.

We also reject Citizens' conclusory contention that "because the EIR's analysis of impacts associated with the emission of contaminants by construction vehicles is deficient," the EIR's conclusion that the project's potential to emit hazardous emissions within one mile of existing schools would be less than significant is not supported by substantial evidence. Because we have found that Citizens failed to show the EIR's air impacts analysis was inadequate with respect to the emission of contaminants by construction vehicles, no further discussion of this related claim is required.

III

*Project Alternatives*

Citizens contends the EIR violated CEQA by failing to identify and consider a reasonable range of project alternatives. We disagree.

A. *Applicable Legal Principles*

"CEQA requires that an EIR, in addition to analyzing the environmental effects of a proposed project, also consider and analyze project alternatives that would reduce adverse environmental impacts." (*In re Bay-Delta, etc.* (2008) 43 Cal.4th 1143, 1163 (*Bay-Delta*).) "An EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the

35

project, and evaluate the comparative merits of the alternatives." (CEQA Guidelines, § 15126.6, subd. (a).)

" 'In determining the nature and scope of alternatives to be examined in an EIR, the Legislature has decreed that local agencies shall be guided by the doctrine of "feasibility." ' [Citation.] CEQA defines 'feasible' as 'capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors.' [Citations.] [¶] 'There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason.' [Citations.] The rule of reason 'requires the EIR to set forth only those alternatives necessary to permit a reasoned choice' and to 'examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project.' " (*Bay-Delta, supra*, 43 Cal.4th at p. 1163.)

" 'The issue of feasibility arises at two different junctures: (1) in the assessment of alternatives in the EIR and (2) during the agency's later consideration of whether to approve the project. [Citation.] But "differing factors come into play at each stage." [Citation.] For the first phase—inclusion in the EIR—the standard is whether the alternative is *potentially* feasible. [Citations.] By contrast, at the second phase—the final decision on project approval—the decisionmaking body evaluates whether the alternatives are *actually* feasible. [Citation.] At that juncture, the decision makers may reject as infeasible alternatives that were identified in the EIR as potentially feasible.' " (*Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 198 (*Mount Shasta*).) The EIR must include an analysis of the alternatives that were found during the scoping phase to be potentially feasible. (*Ibid*.)[7]

---

[7] The scoping process is the screening process by which a local agency makes its "initial determination as to which alternatives are feasible and merit in-depth consideration, and

36

In addition to analyzing a range of reasonable alternatives, an EIR must also examine a no project alternative. "The purpose of describing and analyzing a no project alternative is to allow decisionmakers to compare the impacts of approving the proposed project with the impacts of not approving the proposed project." (CEQA Guidelines, § 15126.6, subd. (e)(1).)

There is no rule specifying a particular number of project alternatives that must be included in an EIR. "CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose." (*Citizens of Goleta Valley v. Board of Supervisors*, *supra*, 52 Cal.3d at p. 566.) The appellant bears the burden of demonstrating that the EIR's alternative analysis was deficient. (*Mount Shasta, supra,* 210 Cal.App.4th at p. 199 [appellant must show that the selected alternatives did not amount to a reasonable range of alternatives or that some particular potentially feasible alternative was excluded].)

" '[I]f a reasonable basis for the choices the agency makes is found in the EIR or elsewhere in the record, a reviewing court will defer to the agency's selection of alternatives.' " (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 256.) We will uphold an agency's choice of alternatives unless they are "manifestly unreasonable and . . . do not contribute to a reasonable range of alternatives." (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1265.)

---

which do not." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 569.)

37

B. *Analysis*

We find no merit in Citizens' initial contention that the EIR is inadequate because the project alternatives it discussed would neither attain most of the basic project objectives nor avoid or substantially lessen any of the significant effects of the project.

An examination of an EIR's alternatives analysis must begin with the project's objectives, for it is these objectives that a proposed alternative must be designed to meet. The statement of objectives should include the underlying purpose of the project. (*Bay-Delta*, *supra*, 43 Cal.4th at p. 1163; CEQA Guidelines, § 15124, subd. (b).) The draft EIR stated that the purpose of the project is to improve the health and safety of the residents of Sacramento by reducing flooding and outflows of wastewater from the combined sewer system by increasing the capacity of the system via the vault, while also meeting the requirements of the City's NPDES permit, which, as discussed *ante*, places limits on the City's discharge of pollutants from the combined sewer system. The draft EIR identified the following objectives for the project: (1) reduce or eliminate outflows during a 10-year storm event that can be considered a possible threat to public health; (2) comply with the requirements of the United States Environmental Protection Agency's "Combined Sewer Overflow Control Policy," "Nine Minimum Controls," the City's NPDES permit, and the Clean Water Act; (3) comply with 2035 General Plan policies, including, among other things, providing adequate utilities, sufficient wastewater service, and rehabilitating and improving the combined sewer system; (4) reduce East Sacramento neighborhood street flooding and outflow problems where it is economically feasible to do so; (5) achieve adequate response to a 10-year storm event throughout the combined sewer system; (6) design and construct new facilities to reduce exposure to flooding and sewer outflows in the combined sewer system, while integrating the new facilities into efficient system operations: and (7) minimize disruption of the use of City parks, streets and neighborhoods during construction.

The draft EIR analyzed three project alternatives and one no project alternative. The draft EIR discussed the ability of the three alternatives to meet the objectives of the project and the environmental impacts of the alternatives. In rejecting the three alternatives and concluding that the proposed project is the environmentally superior alternative, the draft EIR found that none of the alternatives would cause impacts less severe that the proposed project, each of the alternatives would cause environmental impacts more severe than the proposed project, and the alternatives would not or only partially achieve the proposed project objectives as compared to the proposed project.

Although the goal of the alternatives analysis is to consider environmentally superior alternatives that accomplish most of the project objectives (*Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 353), sometimes the alternatives analysis cannot achieve that goal, because it instead reveals that there are no environmentally superior alternatives that will accomplish most of the project objectives. (See *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 1005-1006 (conc. opn. of Mihara, J.).) Here, the draft EIR identified and discussed alternatives to the proposed project and included sufficient information and analysis to inform the decision makers and the public of the various alternatives to the proposed project. Citizens does not argue that the draft EIR failed to include a particular alternative that was potentially feasible. Nor has it shown that, under the circumstances presented, the alternatives did not amount to a reasonable range of alternatives. Indeed, even assuming the EIR should not have discussed the three project alternatives as Citizens claims, Citizens has made no showing that the proposed project and the "no project" alternative, without more, did not amount to a reasonable range of alternatives. (*Mount Shasta, supra,* 210 Cal.App.4th at p. 199 ["Absent a showing that the EIR failed to include a particular alternative that was potentially feasible or that, under the circumstances presented, including only the Project and the 'No Project' alternatives did not amount to a reasonable range of alternatives, plaintiffs' challenge to the alternatives

39

analysis fails."].)  On this record, we cannot conclude that the EIR's choice of alternatives was manifestly unreasonable and did not contribute to a reasonable range of alternatives.  (*Federation of Hillside & Canyon Associations v. City of Los Angeles*, *supra*, 83 Cal.App.4th at p. 1265.)

Equally without merit is Citizens' cursory contention that the EIR's alternatives analysis is deficient because it failed to account for the fact that McKinley Park is a unique site compared to the alternative locations due to its historic nature and listing in the National Register of Historic Places.  As we have discussed *ante*, the EIR considered the historic nature of McKinley Park and determined that the proposed project would not cause a substantial adverse change to the historical significance or integrity of the park, since the park would maintain its existing uses once construction is finished and the historical context would be maintained.

IV

*Recirculation of the EIR*

Citizens contend the City violated CEQA by failing to recirculate the EIR.  According to Citizens, recirculation was required due to the addition of significant new information to the EIR following the public review period.  We disagree.

A.  *Applicable Legal Principles*

An agency is required to recirculate an EIR when significant new information has been added to a previously circulated EIR.  (§ 21092.1; CEQA Guidelines, § 15088.5, subd. (a).)  Recirculation is required to allow further public comment and additional analysis by the agency.  (See *Western Placer Citizens for an Agricultural and Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 899; § 21092.1.)  It is expected that the CEQA process, which includes circulation of a draft EIR, receipt of public comment, and response to these comments, will reveal new information in the final EIR.  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123-1124 (*Laurel Heights II*).)  But, as the City points out,

40

"[r]ecirculation of an EIR was intended to be an exception, rather than the general rule." (*Id.* at p. 1132.)

New information added to an EIR is "significant" when the EIR has been changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect.  (*Laurel Heights II, supra*, 6 Cal.4th at p. 1129.)  Recirculation is required when the new information discloses:  (1) a new substantial environmental impact; (2) a substantial increase in the severity of an environmental impact (unless mitigated to a level of insignificance); (3) a feasible project alternative or mitigation measure that clearly would lessen the environmental impacts of the project, but which the project's proponents declined to adopt; or (4) that the draft EIR was so fundamentally and basically inadequate and conclusory in nature that public comment on the draft was effectively meaningless.  (*Id.* at p. 1130; CEQA Guidelines, § 15088.5, subd. (a).)  But recirculation is not required if the new information merely clarifies, amplifies, or makes insignificant modifications to an otherwise adequate EIR.  (*Laurel Heights II*, at pp. 1129-1130; CEQA Guidelines, § 15088.5, subd. (b).)

"An express finding is not required on whether new information is significant; it is implied from the agency's decision to certify the EIR without recirculating it."  (*South County Citizens for Smart Growth v. County of Nevada, supra,* 221 Cal.App.4th at p. 328.)  Therefore Citizens, as the challenger, "bears the burden of proving a double negative, that the [agency's] decision not to revise and recirculate the final EIR is not supported by substantial evidence."  (*Id*. at p. 330.)  An agency's determination not to recirculate is given "substantial deference" and is presumed "to be correct."  (*Western Placer Citizens for an Agricultural and Rural Environment v. County of Placer*, *supra*, 144 Cal.App.4th at p. 903.)

B. *Analysis*

We reject Citizens' initial argument that recirculation of the EIR was required because the final EIR expanded the project work area by approximately 159,000 square feet and failed to analyze the environmental impacts that might be caused by such an expansion. In support of its position, Citizens does not cite any portion of the draft EIR or final EIR showing an expansion of the project by 159,000 square feet; rather, it points to a letter addressed to its counsel from Terra Nova Planning & Research, Inc. In relevant part, that letter reads:

"The Final EIR states that the Draft EIR analyzed an area of impact greater than the Project now contemplated, insofar as the Project area in the Draft EIR was defined as 300 feet wide by 350 feet long. The Final EIR goes on to state that Appendix B of the document provides the current design, labeled '90% Plan.' What the Master Response fails to disclose or analyze is that the 90% Plan shows an impact area of 440 feet across by 600 feet long, far larger than analyzed in the Draft EIR, and far larger than the reduced vault size of 240 feet by 300 fact. Although we believe that this impact area is much more realistic, given the amount of heavy equipment, vault shoring, worker vehicles and materials storage needed for such a project, nowhere in either the Draft or the Final EIR is such a large area analyzed. As discussed below under air quality, biological resources and cultural resources, this omission results in significant deficiencies in the analysis of both the Draft and Final EIR."

As discussed *ante*, the draft EIR disclosed that the Project would have a maximum construction footprint of 300-feet wide by 350-feet long, and that construction of the vault might require temporary excavation beyond the footprint to allow for safety measures such as shoring and construction equipment access. The draft EIR further disclosed that a construction staging area would be required for the project, and that the staging area would be approximately one-acre in size and located at the north end of the project site. The final EIR stated that the project footprint would be smaller than the

42

maximum footprint analyzed in the draft EIR, as the dimensions of the construction footprint would be 300-feet wide by 240-feet long. The City concedes that the 90 percent drawings included in the final EIR show a "modestly larger" construction staging area than the proposed staging area depicted in the draft EIR, but argues that Citizens has failed to meet its burden to demonstrate that this amounts to significant new information requiring recirculation of the EIR. We agree. Citizens' undeveloped argument fails to show that the expansion of the construction staging area qualifies as *significant* new information requiring an opportunity for further public comment and additional analysis by the City.

We also reject Citizens' contention that the EIR should have been recirculated because the final EIR identified a single access point to the project site whereas the draft EIR contemplated that the project would have two access points to the site. As we have explained *ante*, the record reflects that the draft EIR identified two *potential* access points to the project site, and that the final EIR selected one of those alternatives as the access point for the project. Citizens has failed to show that the City's selection of one of the proposed access routes in the draft EIR constitutes significant new information triggering the need to recirculate the EIR. The public was not deprived of a meaningful opportunity to comment on this issue. As we have noted, the draft EIR contemplated limiting access routes to the project site "when feasible" to minimize impacts to trees.

Finally, we reject Citizens' contention that recirculation of the EIR was required because the draft EIR contained virtually no analysis of the project's impacts on McKinley Park as an historical resource, and the final EIR included seven pages of new analysis on this issue. As we have explained *ante*, the draft EIR acknowledged that McKinley Park had been nominated to be included in the National Register of Historic Places, but its eligibility for inclusion had not been determined at the time the draft EIR was published. The draft EIR explained that, if McKinley Park were found to be eligible for inclusion in the National Register, it would meet the definition of a historic resource

43

under CEQA.  The draft EIR, however, concluded that the proposed project "would not cause a substantial adverse change in the significance of a historic resource as defined by [CEQA Guidelines] section 15064.5 and the Project would have a less than significant impact."  In so concluding, the draft EIR determined that the project "would not cause a substantial adverse change in the significance of . . . McKinley Park since the park would maintain its existing uses once construction is finished and the historical context would be maintained."  The final EIR acknowledged that the State Historical Resources Commission recommended that McKinley Park be included in the National Register of Historic Places, but explained that this did "not affect the adequacy of the cultural evaluation within the [draft EIR]."  The final EIR contained a detailed analysis of why the project would not cause a substantial adverse change in the historic significance or integrity of McKinley Park (and therefore would have less than a significant impact) based on the Secretary of Interior's Standards for Rehabilitation.  Contrary to Citizen's contention, the final EIR does not include significant new information requiring recirculation for further public comment and additional analysis by the City.  The record reflects that the public was not deprived of a meaningful opportunity to comment on the impact of the project on an historic resource.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

<table>
<tr><td></td><td>     /s/</td></tr>
<tr><td></td><td>Duarte, J.</td></tr>
</table>

We concur:

    /s/
Raye, P. J.

    /s/
Krause, J.